## Chesapeake & Ohio Railway Company v. Young's Administrator.

(Decided January 17, 1912.)

### Appeal from Carter Circuit Court.

1. Railroads—Killing of Person at Private Crossing—Evidence—Negligence of Railroad.—Appellee's intestate in attempting to ride horseback over appellant's railroad track at a private crossing, was run over by its passenger train at a point on the track 330 feet west of the crossing, and himself and the horse killed. Held, 1st, That as appellee's evidence conduced to prove appellant's train failed to give any signal of its approach to the private crossing, or for a public crossing a half or three quarters of a mile therefrom; that it was the custom of its trains to give such signals for both the public and private crossings; and that persons using the private crossing were accustomed to rely upon such signals, this evidence together with the frightening of intestate's horse at the crossing by the train and his uncontrollable flight down the railroad track, shown by his tracks in the snow and indentations in the cross-ties made by his shod feet, authorized the submission of the case to the jury, whose province it was to determine from the evidence referred to, and that of appellant, strongly contradictory thereof, whether the death of the intestate was due to the negligence of appellant's engineer in charge of the train, or his own negligence.

2. Same—Proximate Cause.—If, as appellee's evidence tended to prove, the running of the intestate's horse down the railroad track resulted from his becoming frightened at the train, and the consequent inability of the rider to control him, such fright and uncontrollable running of the horse could not have been the proximate cause of the rider's death, if the fright of the horse was caused by the negligence of appellant's engineer, but on the contrary constituted merely an incidental or intervening cause set in motion by the engineer's primary negligence. Therefore, the latter's negligence was the proximate cause of the intestate's death.

3. Instructions.—The instructions, though in some respects inaccurately expressed, were on the whole, not prejudicial to appellant.

SHELBY & SHELBY, R. L. NORTHCUTT, WILHOIT & WILHOIT and H. L. WOODS for appellant.

SCOTT & HAMILTON, R. H. PAYNTER, RUFUS DINKLE and GEO. W. ARMSTRONG for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This is the second appeal in this case. The opinion in the former appeal appears in 136, Kentucky, at page 784.

The action was instituted in the court below by John H. Scott, administrator with the will annexed of the estate of H. B. Young, to recover of appellant damages for his death; it being alleged in the petition that the decedent was killed by one of appellant's passenger trains, which by the negligence of its servants in charge thereof, was permitted to run over him.

The only question presented on the former appeal was as to the ruling of the circuit court in dismissing the action on the ground, that as Young left a will which had been probated, the order of the county court appointing appellee administrator of his estate without, in terms, naming him administrator with the will annexed, was void. It is only necessary to say we held that the legal effect of the order was to make him administrator with the will annexed which gave him the right to maintain the action, consequently the judgment of the circuit court was reversed and cause remanded to that court for trial.

The trial resulted in a verdict and judgment in appellee's favor for $5,000 damages, and the refusal of the circuit court to grant appellant a new trial, occasioned the present appeal.

We gather from the record before us that the stations of Olive Hill and Aden on appellant's railroad are situated in Carter County, and that Corey Hill, which is crossed by the railroad lies between them. Olive Hill, being at the foot of Corey Hill on the west and Aden at the foot of the hill on the east. The grade on this hill is quite steep, being 159 feet to the mile. A county or public road leading from Olive Hill runs parallel with the railroad to Aden, and crosses the railroad twice near the top of Corey Hill; one of these crossings being on the

Aden side just east of the summit. There is a switch on the summit of the hill. West of the switch lies the farm of John P. Gee. The railroad at Gee's farm runs east and west and near the foot of the hill, beyond and south of the railroad from Gee's farm, lies the county road, between which and the railroad, is a small stream called Corey Creek.

There is also a road leading from Gee's residence and land to the county road on the south side of the railroad which goes down a hill through Gee's gate and on to the railroad track, thence down a short hill and across the creek to the county road. On the north side of the railroad track and between Gee's gate and the crossing, the road has been worn to such an extent as to leave a considerable depression with a bank on each side; and on the west side of this place there was a small pile of cross ties.

About three-quarters of a mile west of the Gee crossing is situated the farm of which the decedent was the owner at the time of his death, and upon which he and his family then resided. The county road intersected by the Gee road at the Gee crossing ran through or by Young's farm. Beyond and adjoining Gee's land, somewhat in the direction of Corey Hill, is a farm owned by one McFerran on which there is a burial place known as the McFerran grave yard. On the day he was killed Young attended the burial of a neighbor at the McFerran grave yard. In going to McFerran's he traveled the county road to a point where it was necessary to leave it to get to McFerran's, but after the burial he returned by Gee's house and through his farm over the road referred to as the Gee road, which was a better and shorter route to his home than the one he had taken in going to the burial. It appears from the evidence that the weather was cold, that there was a light snow on the ground that the decedent wore, in addition to his ordinary clothing, an overcoat and also a wrap around his neck. He was horseback and two or three of his neighbors, who were afoot, accompanied him from the burial ground to within 400 yards of the Gee crossing where he left them and went on in the direction of the crossing. Down to this point there is no disagreement between counsel as to the facts, but from now on the divergence of view manifested by the evidence and their respective contentions is marked.

It is contended by counsel for appellant, which contention is supported by the testimony of the engineer

and fireman of the train, that when first seen by the engineer the decedent was in the act of riding upon the crossing; that at that time the train's speed was 40 or 50 miles an hour in going down the grade, and the engine was a little east of a trestle, which was 1,300 feet east of the crossing; that the engine then went on to a curve which caused the decedent to momentarily get out of sight of the engineer, but that when the engine left the curve the engineer saw the decedent riding down the track some distance west of the crossing; that the engine was then near the crossing, the alarm signal was immediately given and the emergency brakes applied; that as soon as the alarm signal was given the decedent, who had theretofore been riding in a fast walk, commenced to violently kick or spur his horse and put him in a gallop down the track, but after going about 60 feet after the whistle was sounded, and reaching a point 330 feet from the crossing, he was overtaken and struck by the engine, he and the horse knocked some distance on the south side of the track, and both instantly killed.

It is further contended by appellant's counsel, arguing from the testimony of the engineer, that at the time the decedent was killed, the train was going down grade with the steam of the engine shut off, and that upon discovering the decedent's peril every effort was made by the engineer to stop the train before it struck him, but that it was impossible to do so. Moreover, that the Gee crossing was a private crossing in approaching which the engineer was under no duty to blow the engine whistle, or slacken the speed of the train; that in getting upon the crossing in view of the train and riding his horse down the railroad track, as testified by the engineer, the decedent was a trespasser and guilty of contributory negligence, but for which he would not have been killed; and that the engineer owed him no duty except that of using ordinary care to protect him after discovering his peril, and this duty he fully performed.

In brief, it is insisted for appellant that upon the facts manifested by appellee's evidence, and again by the evidence as a whole, appellant was entitled to a peremptory instruction directing a verdict for it. On the other hand, it is contended by counsel for appellee that the evidence introduced in his behalf entitled him to a submission of the case to the jury, and also to a verdict.

It is conceded by appellee that appellant's engineer and fireman were the only eye-witnesses of the decedent's

death, but contended that their testimony as to the manner in which it occurred is successfully contradicted by witnesses and certain physical facts, strongly corroborative of their testimony; furthermore, that the evidence as a whole manifested the engineer's negligence and fixed appellant's responsibility for the decedent's death.

The evidence "by word of mouth" showing negligence on the part of the engineer is, it is claimed, furnished by several witnesses who testified that there was no blowing of the engine whistle for or at the public crossing at the top of Corey Hill, a half or three-quarters of a mile from the Gee crossing, or for the Gee crossing, either of which, if given, as was the custom of appellant's trains, would have enabled the decedent in nearing the Gee crossing to know, or afforded him an opportunity to know, of the coming of the train and warned him of the danger of any attempt to cross the railroad track before it passed the Gee crossing.

The physical facts which, it is argued, show the decedent was surprised by the coming of the train, and that he was not guilty of contributory negligence in undertaking to pass over the railroad track at the crossing when and as he did, or in being upon the track below the crossing and at the place of collision with the train, are furnished by the tracks of decedent's horse in the snow and the indentations in and lacerations of the ties made by his iron shod feet, which unmistakably indicate that after getting on the railroad track at the crossing, from fright at the train or some other cause, he immediately wheeled westward and commenced to run in that direction down the railroad track, sometimes between the rails and sometimes outside of them on the end of the ties, until he was overtaken by the engine. The several witnesses who saw the character and width apart of the tracks, took the necessary measurements and examined the marks upon the cross ties, all agreed that they were made by a rapidly running horse and that he began running at the crossing, not after he left it. It is an easy matter for farmers and country people experienced, as were the witnesses referred to, in the nature and ways of the horse, to know from his tracks whether he was walking or running when he made them. These physical facts strongly contradict the statement of the engineer that when he obtained a second view of the decedent he was riding in a fast walk westward down the railroad track. It is true it can not be told from the

physical evidences of the horse's fright what frightened him, but as his tracks made in approaching and in getting upon the crossing furnished no evidence that he was then running and it does not appear from the evidence that there was an object of any kind on or near the crossing which could have frightened him after he got thereon, the inference may reasonably be indulged that his fright was caused by the sudden coming of the train; and the fact that he ran down the railroad track instead of going off of it by way of the crossing, allows the further inference that his rider lost control of him. It is highly improbable that the decedent would have abandoned the safety of the highway, which was but a few feet from the crossing, to ride down the middle of a railroad track which, to say nothing of the danger to be apprehended from the coming of trains, on account of the crevices between its cross ties and the stone ballast projecting therefrom, would afford insecure traveling for a horse, however sure-footed he might be.

It will not be presumed that the decedent in riding upon the crossing, at the time and in the manner that he did, was guilty of negligence. He was not required to stop his horse and look or listen for the train before going upon the crossing, but it was his duty in going upon it to use ordinary care for his own safety; that is to neglect no means that would have been employed by an ordinarily prudent person, similarly situated, to inform himself whether there was a train so near at hand as to make his use of the crossing at the time dangerous to him. It must be admitted that the testimony of appellant's engineer and fireman conduce to prove that the decedent did not exercise such care as we have indicated, but while this is true, the physical facts upon which we have commented contradict the engineer and fireman and strongly tend to prove the absence of contributory negligence. On this issue of fact the evidence was conflicting, therefore, the issue was properly submitted to the jury; if in addition, there was any evidence conducing to prove that the negligence of appellant's engineer caused the decedent's horse to become frightened and run down the railroad track as charged.

If the running of decedent's horse down the railroad track resulted from his becoming frightened at the train and the consequent inability of the rider to control him, such fright and the uncontrollable running of the horse, could not have been the proximate cause of the latter's

death, if the fright of the horse was caused by the negligence of appellant's engineer, but on the contrary constituted merely an incidental or intervening cause thereof set in motion by the engineer's negligence.

"It is well settled that the mere fact that there have been intervening causes between the defendant's negligence and the plaintiff's injuries is not sufficient in law to relieve the former from liability; that is to say the plaintiff's injuries may yet be natural and proximate in law, although between the defendant's negligence and the injuries other causes, conditions or agencies may have operated, and when this is the case, the defendant is liable. So the defendant is clearly responsible where the intervening causes, acts or conditions were set in motion by his earlier negligence, or naturally induced by such wrongful act or omission, or even, it is generally held, if the intervening acts or conditions were of a nature the happening of which was reasonably to have been anticipated, though they may have been acts of the plaintiff himself. An act or omission may yet be negligent and of a nature to charge the defendant with liability, although no injuries would have been sustained but for some intervening cause." * * * 21 Am. & Eng. Ency. of Law, (2nd ed.) 490; Lou. Home Tel. Co. v. Gasper, 123 Ky., 128; L. & N. R. R. Co. v. Eckmon, 137 Ky., 332; Watson v. Ky. and Ind. Bridge Co., 137 Ky., 619.

It now remains to be determined whether there was any evidence of negligence on the part of appellant's engineer which caused the decedent's death. Such negligence will not be presumed any more than would contributory negligence on the part of the decedent be presumed; it must be proved as any other fact.

It may safely be assumed that the decedent would not have gone upon the crossing at the time he did if he had known of the proximity of appellant's train.

It was admitted by appellant's engineer that he did not sound the whistle of the engine in approaching the Gee crossing. He testified, however, as did the fireman and others of the train crew, that the usual whistle signal was given for the public crossing near the top of Corey Hill, a half or three-quarters of a mile east of the crossing. But a number of witnesses introduced by appellee testified that the signal was not given for the public crossing. There was, therefore, a contrariety of evidence on this point.

The failure to give the signal for the Gee crossing was attempted to be justified on the ground that it is a private crossing and for that reason no duty rested upon appellant's servants to give the signal for it.

As to public crossings it is the duty of those operating railroad trains to anticipate the presence thereon of persons traveling the highway, and for that reason there is a statutory requirement that signals must be given of the approach of trains to such crossings attended by a proper slackening of their speed.

In L. & N. R. R. Co. v. Engleman's Admr., 135 Ky., 515, we said of the duty of railroad companies with respect to private crossings:

"The railroad company may run its trains at such speed as it pleases over private crossings and that it is not required to give notice of the approach of the trains to such crossings, unless it has been customary for the signals to be given and they were relied on by persons using the crossing. Johnson v. L. & N. R. R. Co., 91 Ky., 651; Lou. etc., R. R. Co. v. Survant, 96 Ky., 197; Davis v. C. & O. Ry., 116 Ky., 114.

On the other hand it has been held that where it has been customary for signals to be given for the approach of trains to a private crossing, and these were relied on by persons using the crossing, and a traveler on the crossing was struck by reason of the failure to give the statutory signals, a recovery may be had." L. & N. R. R. Co. v. Bodine, 109 Ky., 509; Early's Adm'r v. Lou., etc., R. R. Co., 115 Ky., 13.

There are yet other cases in which we have held that where a private crossing, at which signals of the approach of trains are not accustomed to be given, is contiguous to a public crossing at which such signals are customary and required to be given, and a person using the private crossing is accustomed to rely upon the signals for the public crossing as a means of knowing of the approach of trains to the private crossing, and such person is injured at the private crossing by a train, the coming of which was not made known to him because of the negligence of its engineer in failing to give the customary signals of its approach at the public crossing, such failure would make the railroad company liable for his injuries. Cahill v. Cincinnati, etc., Railroad Co., 92 Ky., 345; L. & N. R. R. Co. v. Survant, 19 R., 1576.

The Gee crossing was established by appellant's vendor, the prior corporate owner of the railroad.

Some of appellee's evidence tended to show that the crossing was originally established as a public crossing, and that for a while after it was made, a sign-board was maintained there designating it as a public crossing.

We do not think this evidence sufficient to make it a public crossing, and besides, it cannot be so characterized as it is not, and has never been, a place where an established public road or highway crossed the railroad track. There was, however, considerable evidence to the effect that the crossing and road leading thereto from Gee's land, were used by the decedent and all others of the community as freely as if it were a public road and crossing; that appellant's trains, had for years maintained the custom of giving the whistle signal in approaching the Gee crossing, and that persons using the crossing and Gee road were accustomed to rely upon these signals for information of the coming of trains.

There was also some evidence which conduced to prove that the same persons in using the Gee crossing, also relied upon the signals given by trains at the public crossing, for notice of their coming to and passing the Gee crossing. Appellant's evidence as to these matters was strongly contradictory of that of appellee, as it conduced to prove that the use of the Gee crossing by persons other than Gee himself, was limited, and that it was not the custom of appellant's trains to give signals for the Gee crossing.

In view of the contradictory character of the evidence it was, as held in L. & N. R. R. Co. v. Engleman's Adm'r, supra, a question for the jury whether the "custom of giving signals for this crossing prevailed to such an extent that persons using the crossing had a right to rely on the signals being given. It is not material that some trains passed the crossing without giving the usual signals, for some trains fail to give signals at public crossings. The case turns on whether there was such a custom to give the signals that persons using the crossing had the right to rely on."

The jury evidently found that there was in this case such a custom, and assuming this to be true, the admitted failure of appellant's engineer to give any signal of the train's approach to the Gee crossing was negligence, to which the jury, from all the evidence, had ground to attribute the fright of the decedent's horse, and his (the decedent's) death. This primary negligence of the engineer being the efficient case, the fright of the horse

and his running on the railroad track until overtaken by the train, were but intervening or secondary events contributing to the result. It is patent from the evidence that appellant was not entitled to the peremptory instruction asked by it.

We are unable to see that there was no evidence upon which to base instruction 5, of which appellant complains. According to the testimony of the engineer the engine was at the east end of the Jordan trestle when the engineer first saw the decedent, who was then about to ride upon the crossing. The trestle is something over 1,300 feet from the crossing. If, when first seen by the engineer, the decedent was in the act of going upon the crossing, he was then in peril, which must have been known to the engineer, who at that time gave no signal to warn the decedent of the approach of the train, nor did he then make any effort to stop the train, or even lessen its speed. In view of these facts, it was the province of the jury to determine from the evidence whether there was opportunity for stopping the train within the 1,300 or more feet and before it struck the decedent, or whether, if this could not be done, the giving of a warning signal with the whistle of the train would have arrested the attention of the decedent, notified him of the proximity of the train, and either kept him from going on the crossing or caused him to hurry over it with such speed as to escape collision with the train. Wilmuth's Adm'r v. I. C. R. R. Co., 25 R., 671. Instruction No. 5 properly submitted for the consideration of the jury this feature of the case.

It cannot be said that instruction No. 6, of which appellant also complains, was prejudicial to it. On the contrary it was more favorable to it than was authorized, as it required the jury, in order to find for appellee, to believe, that it was not only the custom of appellant to give signals of the approach of the train for both the public and Gee crossings, but that persons using the Gee crossing were accustomed to rely upon the signals for both crossings. While this was error, as to appellee, the error was not one of which appellant could complain.

The instructions are in some respects inaccurately expressed, and even complicated, but we can not say, that as a whole, they were prejudicial to the substantial rights of appellant.

Wherefore, the judgment is affirmed.