## Louisville, Henderson & St. Louis Railway Company v. Wilson's Executrix.

(Decided December 19, 1913).

## Appeal from Daviess Circuit Court.

1. Continuance—Trial—Absence of Counsel.—Where the defendant was represented upon the trial by two competent lawyers, it was not error for the trial court to overrule defendant's motion for a continuance upon the ground of the absence, through sickness, of its chief counsel.

2. Continuance—Absence of Witnesses—Discretion of Trial Judge. —Under section 315 of the Civil Code of Practice, the matter of granting continuances on account of the absence of a witness is left largely in the discretion of the trial judge; and when the affidavit as to what the absent witness would testify, if present, is read as the deposition of the absent witness, the discretion of the trial judge in refusing a continuance will not be interfered with, unless it affirmatively appears that the refusal to postpone the trial was prejudicial error.

3. Negligence—Peremptory Instruction—When Should Not Be Given.—Where there is evidence tending to show negligence and also to disprove negligence upon the part of the defendant, a peremptory instruction to find for the defendant should not be given.

4. Negligence—Efficient Cause of Accident—Railroads—Instruction.—Where the primary negligence of the engineer of a railroad company was the efficient cause of the accident, and there was evidence tending to show that the acts of negligence upon the part of the plaintiff were but intervening or secondary events contributing to the result, an instruction merely directing the jury to find for the defendant if they believe that the plaintiff's negligence was the proximate cause of the injury, would be misleading, and therefore, improper.

J. R. SKILLMAN, R. A. MILLER and MILLER, SANDIDGE & MALIN for appellant.

BIRKHEAD & WILSON for appellee.

Opinion of the Court by Judge Miller—Affirming.

This is an appeal from a judgment of the circuit court awarding appellee $800 damages against appellant for negligently killing four mules which belonged to James Wilson.

Wilson operated a coal mine on his farm, in Daviess county, about one-fourth of a mile east of Mattingly Station on appellant's road. The mine was situated about seventy-five yards south of the railroad track. A private road ran from the mine northwardly across the track. There is a public road crossing about three-fourths of a mile east of the private crossing, and Mattingly, the station above referred to, is about one-fourth of a mile west of the private crossing.

Until about two years before the accident Wilson had the opening of his mine located some 1,500 feet east of the present opening; but at the time indicated he moved it to its present location, and had constructed a new road leading from it, as above indicated. There was a private road across appellant's track, leading to the old mine. The new crossing was constructed by appellant.

The new private road was used by Wilson and his employes in going to and from the coal mine, and in hauling coal therefrom.

On December 16, 1911, appellant's Cloverport accommodation passenger train left Owensboro at 7:13 a. m., going westwardly. The engineer gave the usual road crossing whistle for the public crossing three-fourths of a mile east of the private crossing, and also whistled for the old private crossing, which was about 1,500 feet east of the new crossing. When the engine was about 300 feet east of the new crossing, Reid, the engineer, blew a station whistle for Mattingly, at the same time shutting off the steam for the purpose of making a stop at Mattingly. According to Reid, the train was then running at a rate of about 45 miles an hour. When about 300 feet east of the private crossing, Reid and the fireman saw the heads of two mules in the cut where the new road crossed the railroad track. The mules were standing about thirty feet south of the track at the crossing, but on account of the cut through which the road passed, and the bushes and briers upon the east side of it, the engineer was unable to see more than the heads of the mules. Almost immediately thereafter, and when the engine was about 150 feet from the crossing, the mules passed upon the track and were instantly

killed by the engine striking them. The engineer testi-
fies that he applied his brakes in emergency as soon as
he saw that the mules would probably get upon the
track, and at that time he was not more than 150 feet
from the crossing. The railroad operatives also testi-
fied that the bell on the engine had been ringing auto-
matically from the time the train left Owensboro until
the accident happened.

The new road leading from the mine across the rail-
road track is down grade from the mine to the track.
At a point about thirty feet south of where the road
crossed the track the road passed through a cut, which
came down rather abruptly to the right-of-way, thus
making it impossible for one on the track to see a team
in the cut. Likewise, a man driving a team through the
cut could not see a train coming from the east until he
had reached a point within a few feet of the railroad
track.

The road from the mine to the track had been cross-
laid with wood and was slick from the rain that had
fallen the night before. The engineer says the railroad
track along the hill at that point was likewise slick.

Reddish started from the mine on the morning in
question, driving a four-mule team attached to a load
of coal. He was riding one of the wheel mules. At a
point about half-way to the railroad the lock chain of
his wagon broke. He did not attempt to re-lock his
wagon on the hill, because he said it would have done
no good on account of the slick roadbed. He says, how-
ever, the mules were able to hold the wagon steady, and
that when he got within about 30 feet of the track, he
stopped his team for the purpose of listening for the
train. He says he heard no signal, either from the
whistle or the bell. It was while the mules were stand-
ing in this position that the engineer saw their heads
in the cut. Reddish, hearing no whistle or bell, or any
noise of a train, started on down the hill to cross the
track, when he was struck by the train as above indi-
cated.

Payne, another employe of Wilson, had preceded
Reddish across the track with a load of coal. Payne saw
the train coming and called to Reddish, telling him of
it; but seeing that Reddish had not heard the warning,
and had started his team across the track, Payne
jumped from his wagon and ran back to the track, and,
grasping the bridle of the lead mule, attempted to turn

them back, but without success. The engineer was familiar with the crossing and knew the road led from the mine and was liable to be used at almost any time. The wind was blowing from the northwest, and consequently carried the sound of the coming train away from the crossing.

It is conceded the crossing is a private road; but there is abundant testimony tending to show that those in charge of the train had been in the habit of giving warning of its approach by blowing the whistle. The engineer admits that he did not whistle for this crossing on the morning in question, contending, however, that he gave the whistle signal for the old crossing three-quarters of a mile east of the present crossing, and that he also gave the stop signal for Mattingly Station when the engine was within about 300 feet of the private crossing where the accident occurred. But, considering the speed of the train, it must be admitted that the signal for Mattingly served no efficient purpose as a signal for the new crossing only 300 feet distant.

The act of negligence relied upon by the appellee was the failure of appellant's employes to give the usual and customary warning for Wilson's crossing.

The instructions are in line with those usually given in cases of this character, and directed the jury to find for the plaintiff in case they believed from the evidence it had been customary for appellant's trains to give signals of their approach to the crossing in question, and that this custom had prevailed to such an extent that persons using the crossing had reason to rely upon such signals being given, and that the train in question failed to give a reasonable signal of its approach, whereby the mules were killed.

No complaint is made of any of the instructions which were given.

As error, however, appellant contends that the court erred, (1) in overruling appellant's motion for a continuance; (2) in overruling appellant's motion to peremptorily instruct the jury to find for it; and (3) in failing to properly instruct the jury upon appellant's theory of the case.

1. The action was brought on July 3, 1912, in time for trial at the September term of the Daviess Circuit Court. The case, however, was passed and tried at the December term of that court. Appellant moved for a continuance upon the ground of the absence of its chief

attorney, R. A. Miller, on account of sickness; and, further, because of the absence of Payne, the witness above referred to.

We see no error, however, in this ruling of the court. While Mr. Miller was chief counsel for appellant, it was ably and efficiently represented by two other attorneys, who, from every indication that can be gathered from the record, admirably presented the appellant's case, and left nothing undone to properly present it to the court and the jury.

The affidavit showing what Payne would have testified to, if he were present, was read as a deposition. Section 315 of the Civil Code of Practice provides that when the adverse party consents that, on the trial, the affidavit shall be read as a deposition of the absent witness, the trial shall not be postponed on account of his absence.

In construing this code provision in Independent Life Ins. Co. v. Williamson, 152 Ky., 821, we said:

"It will be observed that under this section the matter of granting continuances is left largely in the discretion of the trial judge. The reasons for this are so obvious that it is hardly worth while to state them, and we have written in many cases that this discretion will not be interfered with unless it affirmatively appears that it was prejudicial error. Madisonville, Hartford & Eastern Railroad Co. v. W. M. Allen, 152 Ky., 706.

"It is further apparent that there is quite a difference between refusing a continuance and also refusing to let the affidavit be read as the deposition of the absent witness, and refusing to continue but permitting the affidavit to be so read. It might not be error to refuse a continuance if the affidavit was permitted to be read as the deposition of the absent witness, when it would be error to refuse to permit the affidavit to be read as a deposition and also refuse a continuance. Generally a party has little just ground for complaint if he is permitted to read as a deposition what his witness would testify to if present in person, although his motion for a continuance is overruled, and especially is this true when the attendance of the witness cannot be enforced by the processes of the court and his evidence in the form of a deposition is all that the party has a right to expect."

There is nothing in the record showing that the trial court abused its discretion in overruling appellant's motion for a continuance.

2.   Appellant insists that the jury should have been peremptorily instructed to find for the defendant, because, as it claims, it is shown the appellant's engineer was not guilty of negligence, and did everything within his power to prevent the accident. And, in this connection, stress is laid upon the fact that the lock chain on the coal wagon broke while the wagon was about a hundred feet south of the crossing, and that Reddish did not attempt to replace it, thus making it impossible, according to appellant, for the team to hold the wagon in check while going down the hill in the cut. Reddish, however, is specific in his testimony, not only that the lock chain accomplished no good purpose on account of the condition of the road, but that his team could and did control the wagon.

Furthermore, Reid, the engineer, says: "After I had started to whistle for Mattingly I saw the heads of two mules in this cut standing still; and just after I got to whistling the mules jumped, and I thought they had come towards the track and I applied my air and we struck the mules." According to Reid's testimony, the mules were standing still when they were first seen by him when he was about 300 feet distant. In this respect Reid fully corroborates Reddish, to the effect that his mules could control the wagon, and that he had stopped them about 30 feet south of the track in order to listen for the signal. This fact, taken in connection with the testimony to the effect that appellant's engineer did not whistle for the crossing, made a case for the jury. The court properly overruled appellant's motion for a peremptory instruction.

3.   Finally, appellant insists that, according to its theory of the case, the proximate cause of the injury was not its failure to give a reasonable warning of the train's approach to the crossing, but the failure on inability of Reddish, the driver, to stop his team after he had discovered that the train was coming.

Appellant asked the court to instruct the jury that if the breaking of the lock chain was the proximate cause of the death of the mules, and not the failure of defendant's employes in charge of its train to give a reasonable signal of the train's approach to said crossing, the jury should find for the defendant; and, in support of this

instruction, appellant relies upon L. & N. R. R. Co. v. Onan's Admr., 110 S. W., 380. In the Onan case the proximate cause of the accident was the backing of Onan's horse across the track, and not the failure of appellant's engineer to give notice of the approach of the train. It will be remembered, however, that the lock chain on Reddish's wagon broke when he was about half way between the mine and the crossing, and that, according to the evidence of both Reddish and Reid, the mules had stopped before Reddish attempted to cross the track. Apellant's theory of the case is, that when the lock chain broke, the loaded wagon got beyond the control of the mules, and plunged through the cut and onto the track, thus making the breaking of the lock chain the proximate cause of the injury. The evidence, however, does not sustain this contention, since both Reddish and Reid testified that Reddish had come to a stop at the mouth of the cut, and the mules were standing still when Reid first saw them.

In Conway v. L. & N. R. R. Co., 135 Ky., 229, an eleven-year-old boy had ridden a horse to a creek to water, going across the railroad track. After he had watered his horse and was on his way home riding along the road that ran by the side of the track, a freight train came upon him and frightened his horse, causing him to run towards the crossing. He reached it about the time the engine did, and was struck by the train, injuring the boy. The boy had frequently ridden to water along the same road, and had often met trains about the same place, but the horse had never before become frightened by them. Under those facts we said that Conway could not recover, because the failure to give the signal of the train's approach would not have avoided the injury. In doing so, however, we further said:

"If there was any evidence even tending to show that Conway would have remained at the creek, or not have ridden his horse along the parallel road, or that he would have taken any precautions for his safety, if the train had sounded the crossing signals, a very different question would be presented."

In C. & O. Ry. Co. v. Young's Admr., 146 Ky., 317, the question of the custom of giving the whistle signal at a private crossing is discussed, and, in the course of the discussion, we said:

"The jury evidently found that there was in this case such a custom, and assuming this to be true, the

admitted failure of appellant's engineer to give any signal of the train's approach to the Gee crossing was negligence, to which the jury, from all the evidence, had ground to attribute the fright of decedent's horse and his (the decedent's) death. This primary negligence of the engineer being the efficient cause, the fright of the horse and his running on the railroad track until overtaken by the train, were but intervening or secondary events contributing to the result.''

The same criticism is applicable to Sublett v. M. & O. Ry. Co., 145 Ky., 707, where a team ran away, and, not being in charge of any one, collided with a train, killing the horses. It was there held that although the engineer had failed to give the crossing signal, that failure did not and could not have saved the horses, under the circumstances. It was not the proximate cause of the injury.

We think the court properly laid down the law of the case in the instructions given, and that it properly declined to instruct as requested by the appellant.

Judgment affirmed.