Mary Jane CALHOUN,
et al., Appellants,

v.

CSX TRANSPORTATION, INC.,
et al., Appellees.

No. 2009–SC–000100–DG.

Supreme Court of Kentucky.

Jan. 20, 2011.

Kevin B. Sciantarelli, Bubalo, Hiestand & Rotman, PLC, Louisville, KY, Christopher W. Goode, Bubalo, Hiestand & Rotman, PLC, Lexington, KY, Counsel for Appellant.

David R. Monohan, James Thomas Blaine Lewis, Dinsmore & Shohl, LLP, Louisville, KY, Evan M. Tager, Melanie W. Rughani, Mayer Brown, Washington, D.C., Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

## I. *Introduction*

This is an appeal from a summary judgment order, entered by the Bullitt Circuit Court and affirmed by the Court of Appeals, in favor of Appellees, CSX Transportation, Inc., and one of its engineers. Appellants, Mary and Jesse Calhoun, contend that summary judgment was not appropriate. We accepted discretionary review to consider Appellants' contentions and for the reasons stated below, affirm in part and reverse in part.

The crux of the present controversy centers around whether the particular railroad crossing was public or private, and the corresponding duty a railroad

1. Near Shepherdsville, Kentucky.

2. The Sanitation Company is no longer in business.

3. One of the adjacent landowner's sons operated the Sanitation Company.

owes at such crossing. Generally speaking, at a private crossing, a railroad has no duty of lookout, or to warn (unless it knows that a person is in actual peril of being struck), or to clear vegetation from around its right-of-way. Yet, this minimal duty at private crossings is enhanced in three instances: where a different duty was assumed; if the crossing is, or becomes, ultra-hazardous; or where, by pervasive use, the character of a private crossing has changed to a public one.

## II. *Background*

This case arises out of a non-fatal railroad accident at a crossing in Bullitt County,[1] where a CSX train, operated by Paul L. McClintock, Jr., the engineer, collided with a car driven by Mary Calhoun. As part of her morning routine for three months prior to the accident, Mary drove her sons to work at Bullitt County Sanitation (Sanitation Company), a privately owned company.[2] In doing so, she traversed an unnamed, partially gravel road (the road), which eventually crossed a single set of CSX's north-south railroad tracks at the crossing in question. The Sanitation Company was located on the west side of the crossing.[3] So, her approach in the morning was from east to west and her exit was the reverse.

CSX's track sets in a sixty-six foot right-of-way which perpendicularly intersects the road. This crossing (the BCS crossing) is marked with crossbucks,[4] but has no other warning signs; there is no whistle board[5] immediately prior to the crossing.

4. A sign indicating a railroad crossing, shaped like an "X," generally placed immediately before the crossing.

5. A whistle board is a sign located prior to the crossing, informing the engineer to start sounding the whistle. In Kentucky, a train must start sounding its bell or whistle at least

Additionally, on the Sanitation Company side of the crossing, there is a tree line stretching north into the horizon, running parallel with CSX's right-of-way. Furthermore, at the time of the accident, there was extensive vegetation growth along the Sanitation Company's side of the crossing.

At approximately 6:30 a.m. on December 12, 2001, a dark and foggy morning, Mary Calhoun dropped her sons off at the Sanitation Company, and headed home back over the tracks (heading east). At the same time, a CSX train, operated by McClintock, was heading northbound, en route to Louisville from Nashville. The train approached from Mary's right, traveling at approximately fifty-three miles per hour.[6]

As both approached the crossing, McClintock observed Mary's car approaching through the tree-line near the crossing. At this point, the parties disagree as to whether the train's whistle was sounded prior to reaching the crossing. McClintock and the train's conductor, Ed Harris, testified that the train's whistle *was* sounded when they saw Mary's car approaching the crossing. According to the train's data recorder, however, the whistle was not sounded in the seven seconds prior to impact.

Whatever else did—or did not occur— the train clipped Mary's car's passenger's side rear quarter panel, spinning it around, and ejecting her. She sustained serious injuries and has no memory of the collision.

Mary and her husband, Jesse,[7] initially filed suit against Appellees, CSX and McClintock, as well as the Sanitation Company and the landowners adjacent to the CSX right-of-way and crossing, Kerrin Hester and Charles Burris.[8] They asserted negligence, alleging, *inter alia*, that CSX and its engineer violated their duties by failing to maintain the crossing allowing it to become highly dangerous, and by failing to adequately warn Mary by horn or otherwise.

Following discovery, the trial court granted summary judgment in favor of CSX and McClintock. The court found that CSX did not breach any duty owed to Mary because: (1) the BCS crossing was private and a railroad company's only duty under the circumstances is to warn a person when he is observed in actual peril of being struck by the train; (2) the crossing was private and so, CSX had no duty to clear the allegedly obstructive vegetation; and (3) this crossing was not ultra-hazardous, was not pervasively used by the public, and Mary did not rely on the train blowing its horn so as to alter CSX's duties from the general rule applicable at private crossings; i.e., the three exceptions to the minimal duty rule were inapplicable.

Appellants then filed a notice of appeal. The Court of Appeals affirmed the trial court's summary judgment order on all grounds stated above. Additionally, the Court of Appeals' opinion found that Appellants' arguments relating to drugs prescribed to McClintock were too speculative to defeat summary judgment.[9]

---

fifty rods before a public crossing. KRS 277.190.

6. When exiting the Sanitation Company, the crossbuck sign (prior to the crossing) was to Mary's right; the same direction as the approaching train.

7. Only Mary was involved in the accident; Jesse, her husband, joined her in the current action.

8. The Sanitation Company, Hester, and Burris are not longer parties.

9. The Court of Appeals also ruled on several evidentiary matters that are not before this Court.

Appellants now seek "a determination of whether the 'no duty' private crossing cases" are still viable precedent and "a determination of the proper application of the extrahazardous crossing rule." We address these questions below.

### III. *Analysis*

■ Summary judgment is proper when the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. Furthermore, the evidence "must be viewed in a light most favorable to the party opposing the motion and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991). Finally, to defeat a properly supported motion, the respondent must "presen[t] at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482. With this procedural structure in mind, we review *de novo* the lower courts' legal conclusions that CSX was entitled to judgment as a matter of law.

### A. Public/Private Crossing Distinction.

The distinction between public and private railroad crossings is critical because "the duties required of persons who operate railroad trains, when approaching and passing over public crossings, are very different from those which are required of them at private crossings." *Stull's Adm'x v. Kentucky Traction & Terminal Co.*, 172 Ky. 650, 189 S.W. 721, 723 (1916). As will be further detailed below, our well-established common law imposes a minimal duty for railroad companies at private crossings. The General Assembly, on the other hand, imposes multiple duties on railroads at public crossings. KRS 277.010, *et. seq.*

Therefore, we must determine as a critical threshold matter, whether the BCS crossing was public or private in order to determine the extent of CSX's duty.

### 1. The Gravel Road Traversing the BCS Crossing is Unnamed and Not Maintained by the County

■ Although briefly detailed above, a more thorough description of the crossing is needed to properly consider whether it is public or private. In order to access the Sanitation Company, a driver must turn off of Preston Highway onto an unnamed paved road and proceed west. This paved road eventually leads to the Bullitt County Highway Garage, ending almost immediately thereafter. Bullitt County maintains the paved section of the road. Carroll Samuels, an employee of the Bullitt County Road Department testified that the county paved the road up to the garage. He stated that he considers this paved roadway a driveway to the garage.

This unnamed paved road, however, does not lead directly to the Sanitation Company; rather a driver must proceed further west to another unnamed *gravel* road. This nameless gravel road traverses the railroad crossing, and shortly thereafter ends at the Sanitation Company. Bullitt County does not maintain this gravel road; rather, testimony in the record suggests that Kerrin Hester and Charles Burris, the landowners of the two tracts abutting the railroad right-of-way and crossing maintained the gravel road as needed.[10]

■ Based on our common law, the determinative factor is whether the crossing is situated on a public road. In *Deitz' Adm'x*, we explained, "[f]or a crossing to be a public one the road or street on which it is situated must be a *public road* or

---

10. Hester's son operated the Sanitation Company which lay on the Hester tract.

street established either in the manner prescribed by statute or by dedication, and if in the latter manner there must be an acceptance." *Deitz' Adm'x v. Cincinnati N.O. & T.P. Ry. Co.*, 296 Ky. 279, 176 S.W.2d 699, 701 (1943) (emphasis added). Furthermore, "the only way that a public highway may be established is in the manner provided by statute, or by its dedication to the public use and its acceptance by the proper authorities as a public highway." *Louisville & N.R. Co. v. Whittle's Adm'rs*, 216 Ky. 314, 287 S.W. 894, 895 (1926).[11] We also noted that, "although the acceptance need not be formal, some *control* on the part of the county authorities must be exercised." *Hunt's Adm'r v. Chesapeake & O. Ry. Co.*, 254 S.W.2d 705, 707 (Ky.1952) (emphasis added) (*citing Whittle's Adm'rs*, 287 S.W. at 895).

When applying these principles to the case at bar, we conclude that the BCS crossing is private. There is no contention that the unnamed gravel road was established pursuant to statute and no evidence in the record suggesting that it is controlled by Bullitt County under any form of public dedication. *Whittle's Adm'rs*, 287 S.W. at 895.

Moreover, the Kentucky Transportation Cabinet's listing of public roads does not list this unnamed gravel road, nor is the road included in the listed road systems of the City of Shepherdsville or Bullitt County. Appellants concede this point, stating "[t]echnically, the roadway was never incorporated into the state or county road system." They do claim, however, that the road is owned by Bullitt County as evidenced by two deeds conveying the surrounding lots to Bullitt County.

Without more information, however, Bullitt County's ownership of this unnamed gravel road is unclear from the deeds' cryptic language. And even if we were to assume that the deeds conveyed this nameless gravel road to Bullitt County, there is no evidence that the county ever exercised control over this road: it did not pave it, maintain it, name it, or incorporate it into its road system.[12]

After examining the evidence, we conclude that Appellants failed to "presen[t] at least some affirmative evidence showing that there is a genuine issue of material fact," as to whether the road was public. *Steelvest*, 807 S.W.2d at 482.[13] Conse-

---

11. It appears our older cases used "public highway" and "public road" interchangeably. *See Louisville & N.R. Co. v. Survant*, 96 Ky. 197, 27 S.W. 999, 1001 (1894) ("A public road can only be established in two ways ... statute [and] ... dedication.").

12. As noted above, Appellants do not contend that this road was established in the manner prescribed by statute.

13. Our conclusion that this railroad crossing was private is bolstered by *Gaw v. CSX Transp., Inc.*, wherein a federal court also concluded that this same crossing was private. No. 3:05CV–220–MO, 2008 WL 793655 (W.D.Ky. March 24, 2008). That court noted, as did the Court of Appeals in this case, that the U.S. Department of Transportation lists the BCS railroad crossing as private.

We recognize that *Gaw* held that this same crossing was not ultra-hazardous as a matter of law. However, we do not find this persuasive in the present case for several reasons. Importantly, the accident in *Gaw* occurred in 2005; *over three years after* the accident here. The extent that nature and human action altered the vegetation landscape during these years is unknown (CSX did, however, concede that the large cedar tree—which arguably played a part here—was removed after Mary's accident). Moreover, it is unclear from *Gaw* which the direction the train approached the crossing from: north or south. Consequently, we do not know which part of the vegetation (north or south of the crossing) the court evaluated and found was not ultra-hazardous. Finally, *Gaw* was procedurally decided under FRCP 56(c), the more liberal federal summary judgment standard.

quently, the Court of Appeals correctly concluded that the crossing was private as a matter of law.

### B. Minimal Duty Imposed at Private Crossings

■ Having resolved the threshold issue—determining that the crossing is private—we next consider the duties our common law imposes on CSX.

■ At private crossings, our century-old precedent states that a railroad is "not liable for injuries to a traveler at [a private] crossing unless after discovery of his peril, they fail to use all means to avoid the accident." *Hunt's Adm'r*, 254 S.W.2d at 707; *see also, Chesapeake & O. Ry. Co. v. Hunter's Adm'r*, 170 Ky. 4, 185 S.W. 140 (1916); *Stull's Adm'x*, 189 S.W. at 723–24 (stating that railroad operators must attempt to avoid the injury if they observe the peril in time). Thus at private crossings, "a railway company owes no duty of lookout *or warning*." *Hunt's Adm'r*, 254 S.W.2d at 706–707 (emphasis added).

■ Additionally, and central to the present case, a railroad has no duty to clear vegetation at private crossings. *Spalding v. Louisville & N.R. Co.*, 281 Ky. 357, 136 S.W.2d 1 (1940). *Spalding* involved an allegation that the railroad allowed bushes and weeds to grow up on its right-of-way adjacent to the crossing, which obstructed the driver's view. Utilizing the law of easements, we held that the landowner, as the dominant estate holder, was responsible for vegetation removal. *Id.* at 3. The railroad, as servient owner, had no duty "to maintain in any way the

safety of the private passway for travel." *Id.* We further concluded that as long as the dominant estate owner is not causing "any unnecessary injury" to the crossing, he may "enter upon the servient estate to make whatever repairs were necessary for the safe use of [the crossing]." *Id.* That is not to say, however, that the crossing may not become "ultra-hazardous" because of such growth—an issue we will discuss later.

With this framework in mind, we turn to the present case to examine whether CSX breached its duty by failing to utilize all means to avoid the accident after it discovered Mary Calhoun's peril. Although difficult to discern due to the structure of Appellants' brief, it does not appear that Appellants actually address whether CSX breached this duty.[14] Rather, they claim that "whether CSX had a duty to avoid the accident after discovering [Mary's] peril on the tracks is not what this appeal is about."

Instead Appellants "propose a significant change in Kentucky railroad law" and urge this Court to adopt a new rule based on the "universal doctrine of care" doctrine as stated in *Claywell. Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328 (Ky.1987). Appellants ask us to discard our long-standing, clearly delineated private crossing precedents, and adopt a new framework that "everyone owes everyone else a duty to act reasonably to prevent foreseeable harm to the other." Appellants are not asking us to utilize broad strokes to repaint this area, but rather they request

---

14. Appellants make a fleeting argument that CSX was the *de facto* owner of the road traversing the BCS crossing. They assert that CSX forbade adjacent landowners from removing the trees; a claim based on a statement taken from Hester's deposition wherein he claimed, "I'm not allowed to cut it so

somebody is required to cut it." Given this single accusation, and in light of the evidence suggesting that Hester and Burns maintained the road, we are unable to conclude that CSX was the *de facto* owner. Therefore, CSX had no duty, under *Spalding*, to maintain the vegetation at the BCS crossing.

that we essentially whitewash the entire common law framework created over the last two centuries. In its place, Appellants ask us to implement the amorphous standard that "everyone owes everyone else a duty."

At the outset, the lack of any specificity or contours to Appellants' proposed framework is troublesome. The practicality of replacing over a century's worth of private crossing tort law—and we might add, other specific tort law—and replacing it with a very general duty of care is dubious, at best.

Furthermore, *Claywell* was a dram shop liability case, which utilized the universal duty of care doctrine to expose the archaic common law doctrine that a tavern owner never owes a duty to a third person injured by an intoxicated customer. *Claywell* is inapposite to the present case due to the absence of an equivalent to the "no duty" common law rule in the railroad crossing paradigm. As detailed above, at private crossings, a railroad *has a duty* to exercise ordinary care to avoid injuring a person after it discovers her peril. Therefore, we find the comparison unpersuasive and consequently, decline the invitation to alter our well-established precedent defining the duty owed at private crossings.

### C. Three Exceptions to the Minimal Duty Rule

As previously noted, the private crossings minimal duty rule is qualified by three exceptions: the assumed duty exception; the ultra-hazardous crossing exception; and the pervasive use exception. We now consider the applicability of these exceptions to the present case.

### 1. The Assumed Duty Exception

 A traveler may avail himself of this exception when the railroad customarily signals at the particular private crossing, thereby inducing the traveler to *rely* on that signal. We stated that "[w]here it had been customary to do that and the traveler relied upon receiving such warning, the failure to give it is negligence." *Illinois Central R. Co. v. Maxwell*, 292 Ky. 660, 167 S.W.2d 841, 843 (1943) (*citing Chesapeake & O. R. Co. v. Young's Adm'r*, 146 Ky. 317, 142 S.W. 709 (1912); *Kentucky Traction & Terminal Company v. Brawner*, 208 Ky. 310, 270 S.W. 825 (1925); *Illinois Cent. R. Co. v. Applegate's Adm'x*, 268 Ky. 458, 105 S.W.2d 153 (1937)). Thus, in order to utilize this exception, Appellants must prove that (1) that CSX customarily signaled at this crossing; *and* (2) that Mary Calhoun relied on CSX always signaling at that crossing.

The Court of Appeals in its reasoning, quoted from Mary Calhoun's deposition where she thrice reiterated that she had "never heard a whistle." And in their briefs, Appellants concede that they cannot satisfy the above two-part standard, admitting that "Mary Calhoun had never encountered a train at the actual crossing. Thus, she could never have relied on a signal to detect an oncoming train."[15] Instead, Appellants again urge this Court to change the law and "end the reliance requirement" stated in *Maxwell*.[16] We again decline.

---

15. By this admission, Mary Calhoun also would have no idea what CSX's custom is, since "[she] had never encountered a train at the actual crossing."

16. We disagree with Appellants' claim that the reliance prong rewards railroads for inconsistent practices. If a railroad inconsistently signals at the crossing, we fail to see how a traveler could establish the custom prong—a prong requiring the train to *uniformly and invariably* signal at the crossing.

Removing the reliance prong eviscerates the assumed duty exception. By relying on a customary signal, travelers can reasonably presume that the absence of a signal "is an assurance of safety and the equivalent of an invitation to a traveler to proceed." *Maxwell,* 167 S.W.2d at 843. We see no reason to depart from *Maxwell.*

Unable to satisfy either prong of the assumed duty exception, Appellants contend that *Roberson* altered the assumed duty exception. In *Roberson,* we recognized the "undertaker's doctrine," which imposes liability for the negligent performance of a service undertaken for the protection of a third person. *Louisville Gas and Elec. Co. v. Roberson,* 212 S.W.3d 107, 111 (Ky.2006). In *Roberson,* LG & E contracted with Jefferson County to install and maintain street lamps. *Id.* At issue there was whether LG & E could be held liable for the death of a minor, who was struck by a car after dusk, when one of the street lamps was not illuminated. *Id.*

We refuse Appellants' request to extract a duty from another area of tort law and attempt to remold it into the one-hundred-and-fifty year-old railroad crossing framework. Furthermore, we note that a federal court likewise declined to apply the undertaker's doctrine to a different railroad accident at this very crossing. *Gaw,* 2008 WL 793655, at n. 4 (finding *Roberson* "easily distinguishable," since the instant case pertained to a railroad crossing and lacked a contractual relationship between the parties). The parameters of tort law at private crossings are clearly delineated, and we thus decline to create a new exception.

Based on Appellants' concession, that Mary Calhoun never relied on a train's signal, we affirm the Court of Appeals' holding that Appellants, as a matter of law, cannot avail themselves of this exception.

### 2. Ultra-hazardous Crossing Exception

The second exception to the minimal duty rule concerns private crossings that are found to be ultra-hazardous. *Louisville & N. R. Co. v. Quisenberry,* 338 S.W.2d 409 (Ky.1960). There we explained that:

> There is a well recognized exception to the general rule [at private crossings] where there exist *peculiar or extraordinary circumstances* surrounding a crossing and the facts are known to trainmen. In such cases reasonable care may require that an alarm or signal be given by the approaching train and the question of whether circumstances are such that require a signal is for the jury to determine.

*Id.* at 411 (emphasis added). The question is whether the crossing:

> was a highly dangerous crossing and was so constructed that neither the engineer nor the [traveler] had enough time to do anything to prevent the accident after they came within view of each other ... [thus] the engineer should have warned of the train's approach to this crossing by proper signals.

*Id.* at 410–411. Therefore, when a private crossing is ultra-hazardous, the railroad has a duty to warn those using the crossing.

*Quisenberry* involved a fatal accident where a train struck the traveler's car at a private crossing. *Id.* at 410. The Court described the track as having a sharp curve about 300 feet north of the crossing, and a bluff that "obscures the vision of an operator proceeding south." *Id.* Furthermore, testimony established "that a person approaching within 34 feet of the crossing would be able to see the track for about 500 feet north of the crossing, but when getting closer, he could see only 300 feet in that direction." *Id.* The trial court then submitted the case to the jury "on theory

that if they found the crossing, due to its location and surroundings, to be unusually dangerous ... [they] might reasonably find that the railroad company was negligent in not sounding a horn or whistle when approaching this crossing." *Id.* We held that the case was properly submitted. *Id.* at 411.

In the present case, the Court of Appeals concluded that the obstructive vegetation on the west side of the tracks (the BCS side) could qualify as ultra-hazardous. However, the Court of Appeals utilized a slightly different ultra-hazardous standard set forth in *Hare's Adm'x,* which required the crossing to be "so exceptionally dangerous" that "one exercising ordinary care ... can not see an oncoming train." *Cincinnati N.O. & T.P. Ry. Co. v. Hare's Adm'x,* 297 Ky. 5, 178 S.W.2d 835, 837 (1944).[17]

After reviewing the evidence, the Court of Appeals placed dispositive weight on portions of Mary Calhoun's deposition along with two photos depicting the BCS crossing taken by CSX's agent. The court quoted Mary Calhoun's admission that it was possible to pull her car past the tree line and obtain an unobstructed view of the tracks. Furthermore, the court found that Appellants' forensic mapping expert's opinions (that twenty-two feet from the crossing the sight distance is 263 feet) were "blatantly contradicted by the record," namely, the two CSX photographs. Consequently, the Court of Appeals refused to adopt Appellants' expert's opinions for the purposes of summary judgment, and found that was "it was obvious" that a vehicle could safely pull past the vegetation and see to the horizon. There-

fore, the Court of Appeals found the ultra-hazardous exception inapplicable to the BCS crossing as a matter of law.

■ We agree with the Appellants' contentions that the trial court, as well as the Court of Appeals, made factual findings based on two of CSX's photographs, ignored the factual parallels to *Quisenberry,* ignored other explanatory parts of Mary Calhoun's deposition,[18] and erred by failing to allow a jury to decide whether the ultra-hazardous exception applies. "Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact." *Steelvest,* 807 S.W.2d at 480.

■ In this Commonwealth, it is axiomatic that appellate courts are not fact-finders; and neither are trial courts when ruling on motions for summary judgment. *See e.g., Commonwealth v. Deloney,* 20 S.W.3d 471, 473–474 (Ky.2000). And here, the Court of Appeals exceeded its scope of review when it made factual findings regarding the validity of some of Appellants' evidence. The purview of an appellate court reviewing a summary judgment order is to determine whether there was "some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest,* 807 S.W.2d at 482.

Based on a review of the record, we hold that there is a genuine issue of material fact for trial as to whether the BCS crossing was ultra-hazardous due to the vegetation and the relevant positioning of

---

**17.** That case involved what appears to be a public crossing (Higby Mill Road crossing). The standard quoted in *Quisenberry*—a private crossing case—thus is more appropriate for the private crossing in the case *sub judice.*

**18.** Calhoun also claimed at her deposition that she never had to pull in front of the tree line, stop, and wait as a train passed over the crossing.

the crossing.[19] *Steelvest*, 807 S.W.2d at 482. As stated above, in *Quisenberry*, we approved the trial court's submission to the jury of the issue of whether, *inter alia*, 300 feet of sight line at a private crossing fell within the ultra-hazardous exception. Here, Appellants introduced expert testimony that twenty-two feet from the crossing the sight distance is 263 feet. Whether this crossing was as unusually dangerous as the one described in *Quisenberry*—under the facts of this case—is for a jury, not a trial or appellate court, to decide.

Furthermore, we are not persuaded that CSX's two photographs "blatantly contradicted" Appellants' forensic mapping expert's opinions. A photograph's perspective is easily manipulated by the photographer. In cases such as the present one, photos taken of an accident scene are likely used for litigious purposes. Thus, courts must be cognizant that photographs taken by a litigant's agent are a form of advocacy. Based on the circumstances surrounding these two photographs, we believe the Court of Appeals erred when it assigned them dispositive weight over Appellants' forensic mapping expert's opinions. Rather, the conflict between the expert's opinions and the photographs created a material issue of fact for a jury to resolve.

Therefore, we reverse the Court of Appeals and hold that there is a genuine issue of material fact as to whether the crossing was ultra-hazardous due to the vegetation. As stated above, if the crossing is ultra-hazardous, our common law imposes a duty on the railroad to warn of its approach.[20]

### 3. Pervasive or Habitual Use Exception

The final exception to the minimal duty imposed on railroads involves private crossings pervasively used by the public. Under this exception, "if the crossing is a private one and sufficient evidence is introduced to show habitual use of the crossing by the public, then this use may impose the duty of lookout and warning." *Hunt's Adm'r*, 254 S.W.2d at 707. Although we have not decided a definite number that qualifies as "habitual use," we have held that this exception is inapplicable when sixty, seventy-five, one hundred, one hundred and twenty-five, or one hundred and fifty persons cross daily. *Louisville & N.R. Co. v. Arrowood's Adm'r*, 280 Ky. 658, 134 S.W.2d 224, 226 (1939).

Here however, the Court of Appeals held that the number of persons utilizing the BCS crossing on a daily basis was "well under the level required for the exception to apply." According to the record, the Sanitation Company employed a couple dozen workers and, other than Hester and Burris, only an occasional customer paying a bill used the crossing. Therefore, the Court of Appeals found, as a matter of law, that this exception was not applicable. We agree.

### D. Other Assertions

Appellants assert several other arguments that are tangentially related to the issues for which they sought discretionary review. These arguments all implore this

---

19. If the BCS crossing is ultra-hazardous, the factual dispute regarding whether McClintock sounded the train's whistle becomes crucial. *See Quisenberry*, 338 S.W.2d at 410 (jury may decide whether railroad company was negligent in not sounding a horn when approaching an unusually dangerous crossing).

20. Were the jury to find a breach of such duty, then, of course, issues of comparative fault also arise. *See* JOHN S. PALMORE & RONALD W. EADES, KY. INSTRUCTIONS TO JURIES § 25.06 (4th ed.1989).

Court to expand or create new duties applicable to railroads. As stated above, we decline to change this well-settled area of tort law. Consequently, we succinctly discuss and dismiss the remainder of Appellants' arguments.

Appellants claim that, "as a matter of first impression," Kentucky law should require CSX's engineer, Paul McClintock, to an act in a prudent manner. Appellants assert that McClintock's failure to sound the horn, warning Mary Calhoun of the train's approach, violated CSX's operating rules, and his "common law duty to act as a reasonably prudent engineer." However, the issue of whether McClintock violated CSX's rules brings us full circle to the issue of an assumed duty, which we have already addressed. Moreover, Appellants fail to direct us to a Kentucky case wherein we have recognized such a duty in this context.

Finally, Appellants again seek to probe McClintock's pharmacy records. Appellants allege that McClintock may have taken a combination of prescription drugs before operating the train. We are not persuaded by this argument, as Appellants concede that they "cannot prove or disprove what his actual [drug] consumption level was." Therefore, the Court of Appeals correctly concluded that this speculative argument was insufficient to withstand summary judgment.

## IV. *Conclusion*

For the foregoing reasons, we reverse the Court of Appeals' decision insofar as it relates to the ultra-hazardous crossing exception and remand for further proceedings consistent with this opinion, but otherwise we affirm the remainder of the Court of Appeals' opinion.

21. *Goetzman v. Wichern,* 327 N.W.2d 742

MINTON, C.J.; ABRAMSON, NOBLE, and SCHRODER, JJ., concur.
VENTERS, J., dissents by separate opinion, in which CUNNINGHAM, J., joins.

VENTERS, J., dissenting:

Because the Majority opinion reinvigorates the railroad's virtual immunity from liability at private crossings, I must respectfully dissent and express my concern that, in this case, an unjustified allegiance to the concept of *stare decisis* has led us to neglect our duty, as the highest court of this state, to shape the development of the common law of Kentucky as changing conditions so require. Justice Charles Leibson noted, in *Hilen v. Hays,* 673 S.W.2d 713, 717 (Ky.1984), "the doctrine of *stare decisis* does not commit us to the sanctification of ancient fallacy." Then, quoting the Iowa Supreme Court[21] he added, "(S)tare decisis does not preclude the change. That principle does not require blind imitation of the past or adherence to a rule.... We must reform common law doctrines that are unsound and unsuited to present conditions."

If ever a doctrine was unsuited to present conditions, it is this one. The majority's ruling is based upon the century-old doctrine holding that, at a well-established and frequently used private rail crossing, a railroad company owes no duty of care to warn pedestrians or motorists of an approaching train, and no duty to use ordinary care to lookout for pedestrians or motorists unless the train crew actually sees them in a position of imminent peril; it also exempts railroads from the duty to use ordinary care to maintain its property at a private crossing in a reasonably safe condition for persons whose presence on the property it permits and reasonably anticipates. In essence, the railroad owes

(Iowa 1983)

no duty at an ordinary private crossing except to avoid intentionally injuring someone. What other non-governmental entity in our society enjoys that degree of immunity from tort liability?

The rule I now condemn came into our jurisprudence in an era when the approach of a locomotive was a sight to behold. Unlike the comparatively quiet and unobtrusive diesel engines in use today, our rule was written when trains were pulled by steam locomotives belching smoke and steam that could be seen and heard for great distances. Trees and underbrush growing along the tracks could not hide that approaching danger. Members of the public using a private crossing in those days were not enclosed within the cab of a modern automobile, with its own engine running. Instead, they were out in the open air, on foot, astride the back of a horse or a mule, or sitting on the wooden board of a wagon seat behind one or more horses, which also would not fail to notice the approaching behemoth. Kentucky was more sparsely populated in those days, and most likely had nowhere near the 2,396 private railroad crossings now existent in the state. In summary, when the rule was created the possibility that a private railroad crossing posed a hidden danger to the travelling public was nil. With today's opinion, we perpetuate a rule that is unsound and unsuited to present conditions.

I do not share the majority's concern that we lack "a proposed framework" for restructuring a more fitting standard of care. Our jurisprudence abounds with them. Except for railroads, all property owners have a duty of ordinary care to maintain their property in a reasonably safe condition, and a duty to discover unreasonably dangerous conditions on the land, and to either correct them or warn of their presence. See Kentucky River Medical v. McIntosh, 319 S.W.3d 385, 388 (Ky.

2010), citing Perry v. Williamson, 824 S.W.2d 869 (Ky.1992). That duty would impose no injustice upon the railroad.

Also, owners of electric power line rights-of-way, in constructing and maintaining electric transmission lines where exposure to the dangers of electricity exists, owe the highest degree of care and skill to protect all persons at places where they have a right to be. But even where the danger posed by power lines is not from the ultra hazard of electrical shock, an electric power company stills bears the duty of any property owner to exercise ordinary care for persons whose entry upon the property is foreseeable. See Lee v. Farmer's Rural Elec. Co-op. Corp., 245 S.W.3d 209, 212 (Ky.App.2007). Likewise, owners of natural gas transmission rights-of-way must exercise ordinary care to inspect and maintain their lines in such condition as to prevent the escape of gas therefrom. Moore v. London Gas Co., 372 S.W.2d 270, 272 (Ky.1963). In this day and age, there is no reason why a railroad, crossing through or beside another's land, should not observe the same standards of care we impose upon an electric power line owner or gas line owner crossing though, or beside, the same land.

The intersection of a railroad and a public highway is fundamentally different from a private crossing, and it is reasonable to apply a different duty to each type of crossing. But, using CSX's own words, private crossings are subject to "the no-duty rule," and that notion is antithetical to modern tort concepts. The three exceptions to the "no-duty rule" may breathe the air of conscionability into an unduly harsh doctrine, but still allow railroads the freedom to be careless about all but the most "exceptionally dangerous" crossings. We are remanding this case so that a jury may determine whether this particular crossing was "ultra-hazardous," however

that concept may be defined, and hence, whether the railroad had a duty to warn of the train's approach. In doing so, we misdirect the focus of the inquiry toward the *geography* of the railroad crossing, and away from the *conduct* of these using the crossing, whether by rail or by private road way. A more direct approach, and, in my view, a more just approach, is to recognize that every private crossing poses some degree of danger for both the railroad and those crossing it on a private way, and to impose upon each a duty of ordinary care. The motorist has the traditional duty to exercise ordinary care in the operation of his vehicle for his own safety, and the safety of his passengers and others, including railroad's personnel, and its property; for the railroad, a duty to exercise ordinary care in the operation of the train for the safety of persons crossing the tracks, and the traditional duty of any landowner to maintain its property in a reasonably safe condition, and to exercise ordinary care to discover and correct any unreasonably hazardous conditions, or to warn others of the danger.

A return to this more reasonable standard of care would in no way relieve Mrs. Calhoun of her own duty of ordinary care for her own safety. A jury would undoubtedly take a close look at that. But, there was evidence that the train failed to sound its horn as it approached the crossing on the dark and foggy December morning; that it was travelling at a high speed, and accelerating as it neared the crossing; that the railroad had not trimmed the growth of trees along the tracks that, at least in part, screened the train from the vehicular traffic on the approach to the crossing; and, that the train's engineer had prescriptions for medications that could have impaired his ability. Under an appropriately structured standard of care, those circumstances viewed in the light most favorable to Appellant, sufficiently establish a genuine issue of material fact to negate the railroad's demand for summary judgment.

Accordingly, I dissent because I believe that upon remand of this case to the trial court, we should overrule the obsolete doctrine that unreasonably shields railroads from the duty to exercise ordinary care for the safety of persons at private crossings.

CUNNINGHAM, J., joins.