**LOUISVILLE & NASHVILLE RAILROAD COMPANY, Appellant,**

**v.**

**Sim DUNN, Appellee.**

Court of Appeals of Kentucky.

June 26, 1964.

Glenn W. Denham, Middlesboro, Henry L. Bryant, Pineville, R. H. Daugherty, Marvin D. Jones, James M. Terry, Louisville, for plaintiff in error.

Farmer Helton, Pineville, Doyle & Doyle, George E. Reams, Harlan, for defendant in error.

PALMORE, Judge.

The appellee, Sim Dunn, received $8800 on a jury verdict for personal injuries and property damage sustained when his truck was hit by an L & N train at a public crossing. The railroad company appeals on the ground it was entitled to a directed verdict because Dunn was contributorily negligent as a matter of law. In our judgment the railroad's contention is correct.

The time of the accident was about 5 P. M. on March 4, 1961. The place was what is called the Mocking Bird crossing in rural Bell County. The railroad is a single track running north and south. On its west side, and generally parallel with it, is a county road connecting the villages of Ely and Four Mile. To the east of the railroad is a small community of some nine families known as Mocking Bird Hollow, the only access to which is a dead-end gravel road leading northeastwardly from the Ely-Four Mile road and crossing the railroad at a 40-degree angle. Dunn's vehicle was struck midships on its right side by a northbound train as he was traveling toward Mocking Bird Hollow.

- The distance along Mocking Bird road from the county road to the west rail of the track is 205 feet. The county road lies about 15 feet below the level of the railroad. Facing northward from Four Mile toward Ely, Mocking Bird road splits off from the county road at a very narrow angle, goes up an 8-degree incline, curves gently to the right and flattens as it reaches the railroad bed. There was formerly a second set of rails immediately west of the present track, and this portion of the roadbed is now used by the railroad as a maintenance road. From the exhibits introduced at the trial it would appear that the distance from the center of the existing rails to the west edge of

this flat roadbed, measured along Mocking Bird road, is at least 30 feet. (Measured at right angles from the track it is about 20 feet).

The plaintiff, Dunn, has lived in Mocking Bird Hollow all his life,[1] and the railroad has been there most of that time. On the occasion of the accident Dunn had been to Ely and was driving homeward in his 2½ ton GMC dump truck. He let a passenger out of the truck near a crossing located some ¾ mile north of the Mocking Bird road and at that point observed a "long train" moving north (the opposite direction from that in which he was traveling). When he arrived at the Mocking Bird crossing a few minutes later he says he cut his wheels to the right to get a better view up the railroad, stopped his truck 15 or 20 feet from the nearest rail, leaned forward and looked to his right (south) along the railroad. There was nothing to obscure his view, "Not a thing, it was as clear a view as you ever looked at." He neither saw nor heard anything to suggest the approach of a train.

Dunn approximated the distance of his clear view southward along the railroad as 800 or 900 feet, beyond which it curves away toward the east. A civil engineer employed by the railroad introduced a scale map and testified without objection that an experiment showed that a man standing in the road where Dunn says he was stopped can see a man standing on the track 913 feet to the south. From the testimony and exhibits, we think it is established beyond dispute that Dunn could have seen a train 900 feet away.[2]

Having taken his look, Dunn straightened up, put his truck in "bull dog" gear (extra low) and moved forward a distance of 20 to 30 feet before being hit by the train. He did not again look in either direction up or down the track after putting the truck in

---

1. He was 41 years old at the time of the trial.

2. Dunn testified he had counted 21½ rails (839 feet) from the crossing "to the curve," but did not indicate what point in the curve he used as a terminus.

motion and was oblivious to the presence of the train until after it had struck. He insisted that 35 to 45 seconds elapsed from the time the truck started forward until the moment of impact [3] and buttressed this estimate with testimony (permitted over objection) to the effect that he had since made several experiments at the same place with a lighter and faster truck, which tests had shown that it takes 31¼ seconds to move 19 or 20 feet from a standing position on the road to the nearest rail of the track.

According to the evidence most favorable to the plaintiff, the train [4] scooted the truck a distance of 533 feet up the track before coming to a stop. Dunn, one of those most fortunate of men who can say they were able to walk away after being hit by a railroad train, says that from the rate at which the trees passed by as he was swept along in front of the engine he estimates the speed of the train at 40 m. p. h. His brother, standing on a porch nearby, also saw this phase of the event and places the speed of the train at 35 m. p. h.[5]

The evidence being in conflict as to whether the whistle or bell had been or were being sounded, it is assumed for purposes of this scrutiny that the noise of the diesel motor or motors was the only audible sign of the train's approach. Dunn's right window was closed and the left one open. His hearing was normal. He says the crossing was rough and bumpy, causing his truck to make more noise than otherwise. At any rate, he did not hear the oncoming train.

Two of Dunn's chief witnesses, Estell Pannell and his wife, Thelma, live in a house fronting the west side of the Ely-

Four Mile road between the mouth of Mocking Bird road and the railroad crossing.[6] It is 120 feet from the railroad track straight in front of the house and about 150 feet from the intersection of the track with Mocking Bird road. A line drawn eastward from the middle of the house at right angles with the track would strike the track about 50 feet south of Mocking Bird crossing. At the time Dunn turned up Mocking Bird road the Pannells were seated in the front room. The windows of the house were closed. The front door was open, but a storm door covering it was closed. Mr. Pannell was about 5 feet from a front window through which he could and did see the railroad crossing. He saw Dunn's truck pull up to the crossing and stop. We continue the narrative with pertinent excerpts from his testimony under cross-examination:

"Where did you first hear this train?"

"About the time he pulled up and stopped at the crossing I heard the train."

\* \* \* \* \* \*

"You could see his truck pull up and stop before he got to the crossing?"

"Yes, sir."

"Did you see the train at that time?"

"No."

"But you heard the train coming?"

"Yes, sir."

"You said something about jumping up and running to the window of your house, when did you do that?"

"When I saw Sim Dunn start across the crossing."

3. This would put his speed at less than ½ m. p. h.

4. Which consisted only of two diesel engines coupled back to back and a caboose.

5. The only evidence relating stopping distance to speed was the train engineer's estimate that at 12 to 15 m. p. h. it would have required 12 to 15 car lengths (at 40

feet per car) for him to halt the train with the emergency brakes on. That is the speed at which the train crew testified the train was moving.

6. Thus a person standing in the front door of the Pannell home would see across the county road, Mocking Bird road and the railroad, in that order.

"Why did you jump up and run to the window?"

"I heard the train and figured it was going to hit him."

\* \* \* \* \* \*

"How long did it take you to get from where you were sitting to that window?"

"About two steps, I don't know how long."

"After you got to the window, how long was it before the train collided with Sim Dunn's truck?"

"About the time I looked out the train hit him."

"In other words, by the time you stood up and made the two steps to the window the train hit the truck?"

"Yes, sir, about the time I got to the window."

"In actual time would you say it took you more or less than five seconds to get up and get to the window?"

"I wouldn't know. I took about two steps, but I wouldn't say how many seconds."

\* \* \* \* \* \*

"It was just long enough for you to get out of the chair and take two steps to the window?"

"Yes, sir."

Mrs. Pannell, from her position in the front room, could see a portion of Mocking Bird road but not the crossing. She saw Dunn turn off the county road and heard the noise of the train as she observed him going up Mocking Bird road approaching the crossing. She also saw the train go by and heard the crash "right at once." As in the case of her husband, she declined to venture any time estimates.

Rounding out the picture, the train crew's version of the accident was that Dunn approached the crossing at a "moderate" speed [7] but did not stop, and the train was within a car length of the crossing when it became apparent that Dunn was not going to stop. The emergency brakes were applied immediately, but by the time this was accomplished the engine had hit the truck. These witnesses testified that the train was traveling under a caution signal (resulting from the presence, not far ahead, of the "long train" Dunn had noticed when he let his passenger out of the truck a few minutes earlier) and was moving at a slow speed of 12 to 15 m. p. h.

So there is the case. Is there room for fair-minded, disinterested people to differ on the question of whether Dunn was partially to blame for the accident, or was the verdict in his favor simply another raid on a railroad company by a hometown jury?

We shall not undertake to dissect and present a comparative autopsy of the numerous railroad cases that have been cited and considered. As in most fields of law in which there is frequent litigation, and hence a continuing search for and exposition of what is thought to be the law by men of succeeding generations, the older precedents generally are less persuasive than those of more recent vintage. So it is, for example, that in view of Louisville & Nashville Railroad Co. v. Fisher, Ky., 357 S.W.2d 683 (1962), the basically inconsistent opinion of this court more than 40 years ago in Davis v. Davis, 195 Ky. 522, 242 S.W. 870 (1922), is valueless and must be considered as overruled.

■ The law of contributory negligence today in automobile-railroad cases is exemplified in Nashville, C. & St. L. Ry. Co. v. Stagner, 305 Ky. 717, 205 S.W.2d 493 (1947); McCarter v. Louisville & Nashville R. Co., 314 Ky. 697, 236 S.W.2d 933 (1951); Hunt's Adm'r v. Chesapeake & O. Ry. Co., Ky., 254 S.W.2d 705 (1952);

7. The brakeman said 12 to 15 m. p. h.

Louisville & N. R. Co. v. Troutman, Ky., 351 S.W.2d 516 (1961); Louisville & Nashville Railroad Co. v. Fisher, Ky., 357 S.W.2d 683 (1962); and Hargadon v. Louisville & Nashville Railroad Co., Ky., 375 S.W.2d 834 (1963). These opinions lead to the conclusion that a motorist has the same responsibility of care at a railroad intersection as he would have in entering a superior highway.

 Accepting at face value the rather incredible estimate of Dunn that it took him 35 to 45 seconds to travel a distance of 25 feet or so, due care required that he either continue his lookout or at least look again during the interim. A train approaching from the south at 50 m. p. h. would move 75⅓ feet per second and reach the crossing 12 seconds after coming into view around the curve. At 40 m. p. h. the gap would close in 15.3 seconds, at 30 m. p. h. in 20.4 seconds, at 20 m. p. h. in 30.7 seconds, and at 15 m. p. h. in 40 seconds. Having used this crossing nearly all his life, how could Dunn reasonably have ignored the possibility of a train's approach for a period of half a minute or more between the time he looked and the time he entered on the track? In this respect we accept as valid the railroad's argument that every person has a continuing duty of caution for his own safety, and this duty is not discharged by a momentary caution that is prematurely abandoned.

If, as he apparently contends, Dunn had a right to rely solely on the bell and whistle of the train, then there really was never any need, nor could he have been under a duty, to look at all. That cannot be the law, and if it were, not much room would be left for the theory of contributory negligence. This was the substance of the problem considered in Hargadon v. Louisville & Nashville Railroad Co., Ky., 375 S.W.2d 834 (1963), and the net effect of the opinion was that a person crossing a railroad track cannot discharge his own duty of reasonable care by depending on the railroad.

If in this case the railroad track had been a through highway, and the train a bus, truck or automobile with the right-of-way, unquestionably Dunn would have been contributorily negligent as a matter of law. We see no reason to justify a different law for railroads. So long as the doctrine of contributory negligence as a bar to recovery remains in the law it ought to be enforced equally.

The cause is reversed with direction that appellant's motion for judgment n. o. v. be sustained.