RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PAUL DUGLE, by and through his co-legal guardians Michael Dugle and Brenda Radcliff; MEGAN DUGLE, in her individual capacity,

　　　　　*Plaintiffs-Appellants*,

　　and

KENTUCKY ASSOCIATION OF COUNTIES WORKERS' COMPENSATION FUND; KENTUCKY ASSOCIATION OF COUNTIES ALL LINES FUND,

　　　　　*Intervenor-Plaintiffs,*

　　v.

NORFOLK SOUTHERN RAILWAY COMPANY,

　　　　　*Defendant-Appellee*.

No. 10-6551

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 07-00040—Karen K. Caldwell, District Judge.

Argued: February 29, 2012

Decided and Filed:  June 21, 2012

Before:  COLE, GILMAN, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Glenn A. Cohen, SEILLER WATERMAN LLC, Louisville, Kentucky, for Appellants.  Crawford S. McGivaren, Jr., CABANISS, JOHNSTON, GARDNER, DUMAS & O'NEAL, Birmingham, Alabama, for Appellee.  **ON BRIEF:** Glenn A. Cohen, Paul J. Hershberg, Robyn R. Smith, SEILLER WATERMAN LLC, Louisville, Kentucky, Theodore W. Walton, CLAY FREDERICK ADAMS PLC, Louisville, Kentucky, for Appellants.  Crawford S. McGivaren, Jr., CABANISS, JOHNSTON, GARDNER, DUMAS & O'NEAL, Birmingham, Alabama, Kathiejane Oehler, Justin Gilfert, HUDDLESTON BOLEN LLP, Louisville, Kentucky, for Appellee.

1

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.   Deputy Sheriff Paul Dugle was severely injured when a train operated by the Norfolk Southern Railway Company (Norfolk) struck the police cruiser that he was driving across a set of railroad tracks in Shelby County, Kentucky.  The tracks cross a gravel drive that leads to a county-owned firing range.  Dugle and his wife sued Norfolk for negligence in failing to warn of the train's approach to the crossing.  The district court granted summary judgment for Norfolk after finding that the gravel drive was a private road, that the crossing was not ultra-hazardous, and that there were no measures that the train crew could have taken to avoid the accident after seeing Dugle's cruiser on the tracks.  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this Opinion.

**I.  BACKGROUND**

On the morning of September 1, 2006, Dugle attended a firearms training session at the firing range.  The range is accessible by a single-lane gravel drive leading north off of Kings Highway in Shelby County, with the drive passing through land owned by a local farmer and then across two sets of railroad tracks before entering land owned by the county.   The railroad tracks, which are owned by Norfolk, bisect this drive perpendicularly at grade (a technical term meaning that the tracks are on the same level as the intersecting road) and run in an east-west direction.  Just north of the tracks, a gate to the firing range crosses the drive.  A "no trespassing" sign is posted next to the gate. The parties do not dispute that the drive receives only minimal use by the farmer's family and by law-enforcement officers attending occasional firearms training sessions. There is no evidence that the county maintains the drive, and it is not shown on the official county road map.

On the September morning at issue in this case, Dugle left the firing range in his police cruiser just after 10:20 a.m. and approached the crossing in a southbound direction. Norfolk's train was proceeding eastbound (coming from Dugle's right) toward the crossing at around 33 miles per hour. Despite evidence in the record that Norfolk had placed whistle boards—signs with symbols instructing train crews to sound the engine's horn—on both the eastern and western approaches to the crossing, the crew failed to sound the horn on this occasion. Evidence in the record also indicates that the train was in a coasting mode as it descended a hill leading down to the crossing and that it began the much louder operation of active braking only moments before the collision.

Dugle slowed as he approached the crossbuck sign—a black-and-white "X" sign with the words "railroad" and "crossing" on the crisscrossed arms of the X—on the northern side of the tracks, but the parties dispute by how much and when. Dugle asserts that he was driving as slow as 1.7 miles per hour just prior to the collision, but one of Norfolk's experts calculated Dugle's rate of speed at 8.6 miles per hour. The record contains no further information about Dugle's behavior at the crossing, nor is there any evidence that Dugle actually saw the train prior to the collision. Dugle himself has no memory of the collision, undoubtedly a consequence of the crash itself. But a Railview digital camera mounted to the front of the train demonstrates that Dugle's cruiser was visible to the train's crew for about 4.25 seconds prior to impact. At that point, expert testimony in the record establishes that the train would not have been able to stop in time even if the crew had immediately deployed the train's emergency brakes.

The train struck the passenger side of Dugle's cruiser in the middle of the vehicle and pushed it a total of 178 feet east of the crossing. Dugle spent 11 days in a coma, suffered several broken bones, and incurred a traumatic brain injury. After almost a year of inpatient hospital treatment, he remains permanently disabled.

At the crossing in question, Norfolk maintains a right-of-way of about 30 feet in both directions from the midline of the tracks. An unspecified portion of the right-of-way near the crossing is covered in trees and lower-level overgrowth, but Norfolk asserts that it maintains this area in compliance with Kentucky law and that any remaining

obstructions were located on private property. The line of trees bordering the northern side of the crossing (the side from which Dugle was approaching) abuts the intersection, with much of the foliage sitting approximately 27 to 40 feet from the midline of the tracks. Photographs in the record demonstrate that the railroad tracks begin to curve north around a bend a couple hundred feet west of the crossing in question. Beyond the curve and out of view from the gravel drive is a hill that leads down to the crossing. Norfolk's engineer described the topography approaching the crossing as "a blind wall of woods going down that left side" of the tracks and explained that there was "no way" that he could see "an obstruction sitting at that crossing" when he approached in the train. (Two of the photographs introduced into the record that depict the crossing are attached to this opinion.)

The crossbuck sign on the side of the tracks from which Dugle approached is next to the gravel drive approximately 16 feet from the northernmost railroad track. Under Kentucky law, a crossbuck sign operates like a yield sign, requiring motorists to slow their vehicles and survey the conditions for potential hazards. Ky. Driver Manual, App'x at 1961, 1971-72 ("The familiar crossbuck sign near the tracks is a regulatory sign that means the same as a yield sign," specifying that "the driver must yield to oncoming trains."); *Louisville & Nashville R.R. Co. v. Dunn*, 380 S.W.2d 241, 245 (Ky. 1964) (holding that laws governing highway intersections apply equally to railroad crossings). The crossing at issue does not include a stop sign or any electronic warning device, such as lights or a drop-down gate.

Norfolk's expert witnesses contended that a motorist can see up and down the tracks for several hundred feet in either direction, as long as the motorist is within the 30-foot clearing demarcating Norfolk's right-of-way. But Dugle's expert opined that Dugle's sight lines—the vantage points from which one can see a train approach the crossing—were 94.6% obscured by the surrounding foliage when looking in an eastbound direction (the direction from which the train approached).

The police accident report concluded that Dugle's sight lines allowed for a view of 417.7 feet from the northern crossbuck sign and 455.5 feet from a point past the

crossbuck and just prior to the tracks.  According to Kentucky State Police Officer Trevor Harris, who conducted the post-accident investigation, a train traveling at 33 miles per hour would cover a distance of about 400 feet in "approximately 8 seconds."

In May 2007, Dugle and his wife Megan filed suit against Norfolk in the Shelby County, Kentucky circuit court, asserting common-law negligence claims.  Norfolk removed the case to the United States District Court for the Eastern District of Kentucky on the basis of diversity of citizenship.  Following extensive discovery, the district court initially denied Norfolk's motion for summary judgment, concluding that the gravel drive at issue was private in nature but that the issue of whether the crossing was ultra-hazardous should be submitted to the jury.  A little over a month later, however, the court reconsidered its ruling and granted summary judgment for Norfolk after determining that all reasonable factfinders would find that the crossing was not ultra-hazardous because Dugle could have avoided the collision by stopping at the crossbuck sign.  The court later denied Dugle's motion to alter, amend, or vacate the judgment under Rule 60(b) of the Federal Rules of Civil Procedure.  This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

We review de novo a district court's decision to grant summary judgment. *ACLU of Ky. v. Grayson Cnty.*, 591 F.3d 837, 843 (6th Cir. 2010).  Summary judgment is proper where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.      The railroad crossing is private in nature**

Kentucky law distinguishes between public and private railroad crossings, an important distinction in terms of the duties imposed on a railroad to warn of the train's impending approach to a crossing. At a public crossing, the railroad must comply with multiple statutory and common-law duties. Ky. Rev. Stat. § 277.060 *et seq.* (including the deployment of signs and auditory signals at every such crossing); *Calhoun v. CSX Transp., Inc.*, 331 S.W.3d 236, 240 (Ky. 2011) (acknowledging that the law "imposes multiple duties on railroads at public crossings"); *Gaw v. CSX Transp., Inc.*, No. 3:05CV-220-MO, 2008 WL 793655, at *3 (W.D. Ky. Mar. 24, 2008) (unpublished opinion) ("A railroad company has specific duties to warn, and provide lookout for, traffic at public crossings. These duties vary in scope and degree depending on the particular public crossing, and are mandated by statutory and common law.").

But the duties imposed on a railroad when its train approaches a typical private crossing are "minimal" unless the crossing is deemed "ultra-hazardous." *Calhoun*, 331 S.W.3d at 240, 242; *Gaw*, 2008 WL 793655, at *1. "[A] railway company owes no duty of lookout or warning" at a typical private crossing, nor is the company responsible for clearing vegetation around the crossing. *Calhoun*, 331 S.W.3d at 242 (internal quotation marks and emphasis omitted). Only when the train crew discovers that a motorist is in peril does the railroad acquire a duty to attempt to avoid an accident. *Id.* (requiring that a train crew "utilize all means to avoid the accident after it discovered [the motorist's] peril"). The first issue that we must address, therefore, is whether the crossing at issue is public or private in nature.

Federal law defines a public railway crossing as one where "a public authority maintains the roadway on both sides of the crossing . . . ." 49 C.F.R. § 222.9. Similarly, Kentucky law provides for the creation of public roads through a statutory process of "dedication and incorporation," whereby the road is "dedicated to public use and incorporated into either the state primary road system or the highway or road system of a county or municipality." Ky. Rev. Stat. § 177.010(5); *see also Gaw*, 2008 WL 793655, at *3 (same). Although the method of incorporation or acceptance by the local

government "need not be formal, some control on the part of the county authorities must be exercised." *Calhoun*, 331 S.W.3d at 241 (internal quotation marks and emphasis omitted). A road that does not meet both components of this process (i.e., public dedication and government control) is considered private. *Gaw*, 2008 WL 793655, at *3.

The district court concluded that the gravel drive at issue was private in nature based on evidence from a county official and the local farm owner that the county did not maintain the drive and that a gate on the north side of the tracks included a no-trespassing sign. Although Dugle provided testimony from another county official who believed that the drive was paved and therefore was a public road, the court noted that the official's belief was clearly erroneous based on the evidence in the record. The court also noted that Dugle had produced no evidence that the county in fact maintained the drive.

In sum, Dugle failed to "presen[t] at least some affirmative evidence showing that there is a genuine [dispute] as to whether the road was public." *See Calhoun*, 331 S.W.3d at 241 (internal quotation marks omitted; first brackets in original). We therefore agree with the district court's conclusion that the gravel drive is private in nature.

**C.    Summary judgment on the "motorist-in-peril" argument was improper**

The private-road designation, however, does not end our inquiry. Although the duties imposed on train crews approaching private crossings are minimal, the railroad does have a duty to "utilize all means to avoid the accident after it discovered [the motorist's] peril," *id.* at 242, an obligation that the district court described as the "motorist-in-peril" doctrine. In order to impose this duty on a train crew, the motorist's perilous condition must be "discovered in time to prevent injury." *Louisville & Nashville R.R. Co. v. Wallace*, 302 S.W.2d 561, 564 (Ky. 1957); *see also Louisville & Nashville R.R. Co. v. Hall*, 327 S.W.2d 400, 402 (Ky. 1959) ("It is not the discovery of the person but the discovery of peril that is important."). The key issue that we must

consider, therefore, is whether Norfolk had the ability to avoid the accident once it discovered that Dugle was in peril.

Norfolk argues that the train crew believed that Dugle would stop before he reached the tracks, but this belief does not necessarily relieve the crew of its obligation to take appropriate action to avoid a potential accident.  The point at which they should have considered Dugle in peril—whether that point was only after he actually moved onto the tracks or was when he moved past the crossbuck sign without stopping—is an issue of fact for the jury.  *See List v. S. Ry. Co.*, 752 S.W.2d 791, 793 (Ky. Ct. App. 1988) (determining that "[w]hether the [plaintiffs] were in peril is a fact issue the jury can decide").  Dugle's conduct in passing the crossbuck sign without stopping suggests that he was not going to stop at all, and reasonable jurors could disagree as to precisely when the train crew's duties were triggered under these facts.

Moreover, Dugle argues that the train crew should have sounded the engine's horn as soon as the front bumper on his cruiser entered the crew's field of vision. Relying on the time calculations of Norfolk's own experts, Dugle contends that he would have been able to brake in time to avoid the collision.  Dr. Raymond Brach, one of Norfolk's experts, indeed testified at his deposition that "when Deputy Dugle first had a line of sight, he was approximately thirty feet from the point of impact.  [He w]as traveling at approximately 8.6 miles per hour, and could have stopped in approximately five feet.  So that would certainly qualify as his being able to avoid the accident."  And Dr. Joseph D. Blaschke, another of Norfolk's experts, testified during his deposition that, if Dugle had a one-second response time, he could have braked before his cruiser reached the tracks.  Even with a more likely one-and-a-half-second response time, Blaschke testified that Dugle could have braked with no more than his front bumper over the tracks, which would have allowed him to avoid the brunt of the accident.

Norfolk does not dispute that the train crew took no action until Dugle moved onto the tracks, which was approximately three to four seconds after the front bumper of his cruiser first entered the crew's field of vision; only then did the crew begin applying the train's brakes.  It instead argues that the accident was unavoidable because

its train crew had at most 4.25 seconds within which to react to Dugle's presence, as depicted by the Railview camera. Thomas McNish, one of Norfolk's experts, supports this contention by opining that sounding the horn when the crew first saw Dugle's cruiser would have had no effect on the ultimate collision. McNish explained that the crew would require one "full second to determine that the car was moving at such a rate that it might not stop, plus . . . the reaction time of crew member[s] to blow the horn, plus you then have to add the reaction time of Mr. Dugle . . . , which is at least another second," at which point "at least a significant portion of his car is still going to be on the tracks at the time that the train crosses the grade." He also testified that Dugle would have only "about a three quarter of a second window to see the train and bring his vehicle to a stop before part of it, at least, was struck by the train."

The district court found the record devoid of evidence that the train crew could have avoided the collision after the crew first spotted Dugle's cruiser. But this finding is not necessarily determinative because a reasonable inference arises from both Officer Harris's accident report and the testimony of Norfolk's own experts, Brach and Braschke, that *Dugle* could have braked in time to avoid the collision if he had been warned when his cruiser first became visible to the train crew. Because we must consider these circumstances in the light most favorable to Dugle at the summary-judgment stage of the case and because there is a genuine factual dispute sufficient to warrant a jury resolution of this issue, the district court erred in granting summary judgment for Norfolk on the motorist-in-peril doctrine.

### D.        Applicability of the "ultra-hazardous-crossing" exception

The district court further erred in not allowing a jury to consider whether the private crossing at issue was ultra-hazardous. Where a crossing is found to be ultra-hazardous, the general rule against imposing duties on train crews at private crossings does not apply. *Calhoun*, 331 S.W.3d at 244; *see also Louisville & Nashville R.R. Co. v. Quisenberry*, 338 S.W.2d 409, 411 (Ky. 1960) (applying this exception to private crossings involving "peculiar or extraordinary circumstances"). The ultra-hazardous-crossing exception recognizes that circumstances might exist where an ordinarily

prudent person would not become aware of the danger posed by an approaching train without a specific warning from the train's crew. *Jewell v. CSX Transp., Inc.*, 135 F.3d 361, 363 (6th Cir. 1998) (applying this principle to a crossing that the court untimately deemed not ultra-hazardous because "no structure or object . . . impaired [the plaintiff's] view of the train . . . from the last 2,200 feet to the crossing"). At an ultra-hazardous private crossing, "the railroad has a duty to warn those using the crossing." *Calhoun*, 331 S.W.3d at 244.

An ultra-hazardous crossing is "one that obscures the view of the traveling public approaching a crossing. This may consist of cuts, embankments, vegetation or other obstacles that obstruct the view of the traveling public in close proximity to the crossing." *Wright v. Ill. Cent. Gulf R.R. Co.*, 550 S.W.2d 489, 491 (Ky. 1977); *see also Quisenberry*, 338 S.W.2d at 410-11 (describing the crossing in question as "highly dangerous" based on its "location and surroundings," which were such that "neither the engineer nor the decedent had enough time to do anything to prevent the accident after they came within view of each other").

The Kentucky Court of Appeals has cautioned that "a real and substantial obstruction to sight or hearing" must be present in order for the crossing to be considered ultra-hazardous. *Hargadon v. Louisville & Nashville R.R. Co.*, 375 S.W.2d 834, 838 (Ky. Ct. App. 1963). Such an obstruction may include the overgrowth of vegetation and similar transitory conditions. *Calhoun*, 331 S.W.3d at 242.

In *Quisenberry*, the Kentucky Supreme Court affirmed the lower court's decision to submit this issue to a jury. The evidence before that Court showed that the motorist's visibility diminished as he approached the crossing and that a curve in the tracks 300 feet from the crossing in one direction and a bluff on the concave side of the curve obscured his view of oncoming trains. *Quisenberry*, 338 S.W.2d at 410. In addition, the train was coasting on its approach to the crossing, which substantially reduced the amount of noise it generated, and the crew did not sound the engine's horn (although the bell was ringing). *Id.* at 410, 411. The opinion makes no mention of any signs—either stop signs or crossbuck signs—that warned motorists of the approaching crossing. Considering all

of the evidence, the Kentucky Supreme Court concluded that the decedent lacked the ability to see the approaching train in time to avert the accident, and it expressed doubt as to whether he would have been able to hear the train even if he had used all of his faculties. *Id.* at 412. The *Quisenberry* court therefore affirmed the judgment of the lower courts in favor of the motorist.

In its *Calhoun* decision, the Kentucky Supreme Court recently reaffirmed the vitality of *Quisenberry*. The Court relied on *Quisenberry* to conclude that the ultra-hazardous-crossing issue before it should have been submitted to a jury. *Calhoun*, 331 S.W.3d at 246. Although the crossing in *Calhoun* was marked with a crossbuck sign, the crossing also included extensive vegetation growth and a tree line that paralleled the tracks in one direction. *Id.* at 238-39. The parties disputed whether the train sounded its horn, and the plaintiff's experts opined that a motorist sitting 22 feet from the crossing could see only 263 feet in the direction of the train's approach. *Id.* at 239, 246. Under these circumstances, the *Calhoun* court concluded that a jury should have determined whether the crossing was ultra-hazardous in nature.

The district court in the present case initially reached the same conclusion. But in a revised opinion issued prior to the Kentucky Supreme Court's decision in *Calhoun*, the district court concluded that no reasonable factfinder would deem the crossing at issue ultra-hazardous because, notwithstanding any topographical conditions around the crossing, Dugle had failed to stop at the crossbuck sign before proceeding onto the tracks. The court also concluded that Norfolk had sufficiently warned Dugle about the potential presence of the train through its crossbuck sign. Had Dugle stopped at the crossbuck to look in either direction (rather than merely yield and look), the court reasoned, he would have been able to see the train approaching for more than 400 feet. Because the court concluded that "the relevant visual stimulus in determining whether this crossing is ultrahazardous is not the train but the crossbuck," the latter being indisputably visible, the court held that the crossing was not ultra-hazardous as a matter of law.

The district court's determination is erroneous for several reasons. First, the court's conclusion that the crossbuck sign was the "relevant visual stimulus" is not supported by Kentucky law. Prior cases that have turned on the presence of a warning sign have all involved *stop* signs—which Kentucky courts have described as encompassing a warning about approaching threats—rather than crossbuck signs. *See, e.g.*, *Louisville & Nashville R.R. Co. v. Fisher*, 357 S.W.2d 683, 689-90 (Ky. Ct. App. 1962) (holding that a motorist who failed to heed a stop sign, which marked a set of railroad tracks along with the standard crossbucks signs, was guilty of contributory negligence and thus barred from recovery as a matter of law); *Gaw v CSX Transp.*, No. 3:05CV-220-MO, 2008 WL 793655, at *5 (W.D. Ky. Mar. 24, 2008) (distinguishing *Quisenberry* on the ground that the facts in *Gaw* involved stop signs placed both before and after the allegedly obstructing vegetation).

As both parties have pointed out, a crossbuck sign is the functional equivalent of a yield sign. It requires motorists to slow down and observe the surrounding conditions prior to proceeding, and then to stop if the observed conditions so require. *See* Ky. Rev. Stat. § 189.560 (requiring vehicles to come to a stop at a railroad crossing when, among other things, "[a]n approaching train is visible and in hazardous proximity"); Ky. Rev. Stat. § 189.330(5) (requiring vehicles approaching a yield sign to slow down to a speed that is reasonable for existing conditions and to stop if required for safety). No case has required that a motorist come to a full stop at a crossbuck sign without having actually seen an approaching train; rather, motorists are required only to exercise their senses as would an ordinarily prudent person. *See Fisher*, 357 S.W.2d at 690-91 ("We have never held . . . that the plaintiff [approaching a crossing] must first show he had stopped, looked and listened before he drove upon the track . . . ."). The district court's conclusion to the contrary—which construes the presence of a crossbuck sign as a sufficient warning to motorists of approaching trains—is erroneous.

Neither *Quisenberry* nor *Calhoun* turned on the presence of a crossbuck sign. Both cases instead examined the landscape surrounding the crossing and the visibility available to an approaching motorist. The *Calhoun* Court in fact determined that the

ultra-hazardous-crossing issue in that case should have been submitted to a jury despite the presence of a crossbuck sign at the crossing. And *Quisenberry* noted that a pertinent factual issue is "whether the *engineer* should have warned of the train's approach to this crossing," suggesting that the warning is specific to the train's approach and cannot be fulfilled solely through the use of a crossbuck sign. *Quisenberry*, 338 S.W.2d at 411 (emphasis added).

A crossbuck sign simply alerts motorists to the existence of a railroad crossing. It does not, and cannot, provide information about the location of a train in reference to the crossing at any given time. True enough, neither does a stop sign; but the Kentucky courts have determined that stop signs function to warn of impending dangers at all times and therefore require motorists to use a heightened level of care when approaching crossings that are so marked. *See Fisher*, 357 S.W.2d at 689-90. In sum, the presence of a crossbuck sign does not absolve the railroad of its duty to warn where the crossing is deemed ultra-hazardous.

Moreover, cases that impose a heightened duty of care on individuals approaching potentially hazardous crossings were all decided under the doctrine of contributory negligence. *See, e.g.*, *id.* at 689-92 (determining that the motorist was contributorily negligent for failing to stop at the posted stop sign, thus barring any recovery). But this doctrine was abolished in Kentucky several decades ago and was replaced with the doctrine of comparative negligence, which "will not bar recovery but shall reduce the total amount of the award in the proportion that the claimant's contributory negligence bears to the total negligence that caused the damage." *Hilen v. Hays*, 673 S.W.2d 713, 720 (Ky. 1984) (creating this doctrinal change in a negligence case involving an automobile accident).

Under the comparative-negligence doctrine, the issue of whether Dugle reasonably exercised his faculties of sight and hearing when he approached and traversed the crossing calls for an evaluation regarding the hazardous nature of the crossing and the extent to which Dugle may recover damages, buts does not affect the availability of his cause of action in the first instance. *See Quisenberry*, 338 S.W.2d at 411-12

(rejecting the contributory-negligence framework and holding that a jury issue remained on the hazardousness of the crossing because the record lacked evidence that the motorist actually saw the approaching train). Dugle's actions cannot therefore be used by the court to deny his claim outright and do not undermine the need for a jury's resolution of the ultra-hazardous-crossing issue.

Turning to the merits of this issue, Dugle presented evidence that his sight lines to the right of the crossing were 94.6% obscured by foliage and by a bend in the tracks, and his expert witness produced a diagram depicting the train hidden behind these obstructions at the time that Dugle neared the crossing. Furthermore, Norfolk's own engineer conceded that the crossing was preceded by a "blind wall of woods" around which there was "no way" to see a motorist. Several photographs of the crossing support this description of the evidence, highlighting the substantial obstruction created by the combination of the tree line and the track's curvature, as well as the short distance between the crossbuck sign and the tracks. In addition, the record reflects that Norfolk's crew had put the train into coasting mode in order to control the train's speed down the hill as it approached the crossing. This reduced the noise emanating from the train, making it more difficult for a motorist in Dugle's position to hear the train coming.

Finally, Norfolk does not dispute that its crew failed to comply with the directive posted on the whistle board to sound the train's horn well before entering the crossing. Officer Harris's accident report concluded that "[i]f the train would have sounded the whistle at the whistle board, Deputy Dugle could have been warned of the oncoming train." Norfolk's deployment of the whistle board suggests that the railroad itself recognized the hazardous nature of this particular crossing, and a jury may conclude that the train crew breached Norfolk's duty to approaching motorists by failing to sound the train's horn as so instructed.

Photographs and descriptions introduced by Norfolk, on the other hand, suggest that Dugle had adequate space to see the train, given the setback of the crossbuck sign and the distance to the right before the track's curve. The evidence in fact indicates that Dugle had longer sight lines (over 400 feet) than did the plaintiffs in *Calhoun*,

331 S.W.3d at 239, 246 (involving a 263-foot sight line), or *Quisenberry*, 338 S.W.2d at 410 (involving a 300-foot sight line).  But no Kentucky case has concluded that sight lines of over 400 feet mandate that the crossing be considered safe as a matter of law.  At what point a sight line becomes sufficient to render a crossing not ultra-hazardous is thus a question of fact for the jury.

Viewing the evidence in the light most favorable to Dugle, the record supports the conclusion that a genuine dispute remains as to whether the private crossing at issue was ultra-hazardous.  This does not mean that Dugle will necessarily prevail before a jury, but it does mean that the issue is not "so one-sided that [Norfolk] must prevail as a matter of law."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  We therefore set aside the district court's grant of summary judgment on this issue.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this Opinion.



